## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN R. MINEO,            )
                            )
         Plaintiff,     )
                            )    Civil Action No. 06-3 Erie
                            )
         v.          )
                            )
JO ANNE BARNHART,      )
Commissioner of Social Security,  )
                            )
         Defendant.   )

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, John R. Mineo, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that he was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Mineo filed an application for SSI on June 15, 2000, alleging disability since November 16, 1996 (Administrative Record, hereinafter "AR", at 138-140). His application was denied initially, and Mineo requested a hearing before an administrative law judge ("ALJ") (AR 89-93). A hearing was held on May 7, 2001, and on October 19, 2001, the ALJ found that Mineo was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 62-73; 450-479). Following a denial for review by the Appeals Council, Mineo filed an appeal in this Court. On June 28, 2002, upon the Commissioner's motion, we ordered a remand of the October 19, 2001 decision (AR 104-106).

On October 7, 2003, a second hearing took place, and a different ALJ issued an unfavorable decision (AR 74-88; 480-508). Following Mineo's request for review, the Appeals Council remanded the case on December 16, 2003 (AR 118-122). A third hearing took place on September 1, 2004, and on November 23, 2004, the ALJ again issued an unfavorable decision (AR 5-16; 509-547). Mineo's request for review by the Appeals Council was denied, rendering the Commissioner's November 23, 2004 decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for

summary judgment.  For the reasons set forth below, both motions shall be denied and the case shall be remanded to the Commissioner for further proceedings.

## I. BACKGROUND

Mineo was born on June 5, 1964, and was forty years old on the date of the ALJ's decision (AR 9; 138).  He obtained a G.E.D. in 1987, and worked as a heavy laborer in concrete construction (AR 9).

While the record reflects that Mineo was treated for several physical issues, the only alleged impairments at issue in this appeal are his mental impairments and his post-traumatic headache disorder.  We shall therefore confine our discussion accordingly.

*A.     Mental impairments*

Mineo was psychologically evaluated by Melvin Carney, Ed.D, a licensed psychologist, on September 29, 2000 pursuant to the request of the Commissioner (AR 293-296).[1]  Dr. Carney reported Mineo's speech was clear, readily understood, and he "use[d] language well" (AR 293).  During the evaluation, he was pleasant, cooperative and maintained good eye contact (AR 293).  Dr. Carney reported that his affect appeared to be diminished, and he appeared anxious and easily frustrated (AR 293-294).  Depression was noted, as well as "underlying hostility" that Mineo was "trying to deny and repress" (AR 294).  Dr. Carney noted that he had neurotic traits but was not psychotic, and he denied suffering from hallucinations or delusions (AR 293).  Mineo claimed he was depressed and anxious because he was "stagnating", but was unable to break out of his unsatisfactory pattern of coping with reality (AR 294).

Dr. Carney found that Mineo's abstract thinking was above average, he showed talent in the use of mathematics, and was capable of good social judgment unless he became frustrated and acted impulsively (AR 294-295).  He estimated Mineo's intellectual potential to be in the upper one-third of the population of age peers, but found that his anxiety, depression and frustration would cause him to lose direction in completing tasks (AR 295).  Dr. Carney indicated that Mineo gave up easily, had low self esteem, did not have the confidence to persevere when

---

[1]During this evaluation, Mineo reported that he had received previous psychiatric treatment from 1996 through 1999 (AR 294).  The ALJ issued a subpoena for the treatment records from Victor Bichara, M.D., however, the records were apparently never produced and are not a part of the administrative record.

faced with adversity, but could understand and follow complicated instructions (AR 295).  He had no memory problems; only concentration and attention problems (AR 295).  Dr. Carney opined that Mineo had "considerable intellectual potential," but it had not been honed or trained (AR 295).  He was not highly dependable or able to persevere to complete complicated tasks because of his self-doubts, and his feelings of frustration and inadequacy caused depression, anger and hostility (AR 295).  Dr. Carney opined that his potential and relatively young age militate that he be assisted in doing something positive with his life (AR 295).  He diagnosed Mineo with dysthymic disorder and adjustment disorder with anxiety, found his prognosis was "optimistic," and assigned him a Global Assessment of Functioning ("GAF") score of 55 (AR 295-296).[2]  Dr. Carney recommended vocational/career evaluation, psychotherapy and a psychiatric evaluation to determine any psychopharmacological needs (AR 296).

Dr. Carney concluded that Mineo had an "unlimited/very good" ability to follow work rules; understand, remember and carry out simple, detailed and complex job instructions; and maintain personal appearance (AR 297-298).  He had a "good" ability to relate to co-workers; use judgment; and interact with supervisors; and a "good" to "fair" ability to deal with work stresses and maintain attention/concentration (AR 297).  Finally, Dr. Carney found that Mineo had a "fair" ability to deal with the public; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability (AR 297-298).

On October 24, 2000, Ray M. Milke, Ph.D., a state agency reviewing psychologist, completed a Mental Residual Functional Capacity Assessment form and found that Mineo was not significantly limited in a number of areas, but was moderately limited in his ability to maintain attention and concentration for extended periods (AR 211).  He was also moderately limited in his ability to interact appropriately with the general public; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals

---

[2]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

or make plans independently of others (AR 312-313). On a Psychiatric Review Technique form completed the same date, Dr. Milke concluded that Mineo had a mild degree of limitation in his activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence or pace; and there was insufficient evidence of repeated episodes of deterioration or decompensation in work or work-like settings (AR 308).

Treatment notes from Antonio Flores, M.D., Mineo's treating neurologist, reflect that he was prescribed Zoloft from June 1999-December 2001 (AR 252; 254-258; 344-347).

Mineo underwent a psychiatric evaluation performed by Fuat Ulus, M.D., at Community Integration, Inc. on December 27, 2001 (336-338). He reported feeling apprehensive, isolated, empty, depressed, anxious and fearful at times (AR 336-337). He further reported early morning awakening, tiredness, low energy, decreased appetite, and had periods where he did not want to leave the house (AR 336). Dr. Ulus noted that he was very congenial and polite during the examination, and although reserved at first, became more relaxed and talkative throughout the evaluation (AR 337). On mental status examination, Dr. Ulus found Mineo was alert, had adequate eye contact and hygiene, was appropriately dressed and had optimal psychomotor activity (AR 337). His speech was spontaneous and productive, his thought processes were organized, relevant and coherent, and although his mood was depressed, his affect was appropriate (AR 337). Dr. Ulus found his intellect was between average and above average, his memory was intact, his judgment was adequate, his insight appropriate and he did not present with any thought content problems (AR 337).

Dr. Ulus diagnosed Mineo with depressive disorder, dysthymic disorder, major depressive disorder in remission, agoraphobia with panic attacks, and assigned him a GAF score of 55 (AR 337). He noted that Mineo appeared motivated to seek help, and recommended the continuation of Zoloft for depression and Desyrel as a sleep aid (AR 337-338). He added Ativan for anxiety and recommended group therapy (AR 338).

Community Integration treatment notes dated January 14, 2002, reflect that Mineo's condition was stabilized, and he reportedly had achieved many things in the past several weeks that he had not been able to do in years (AR 342).

Roger Glover, Ph.D., a state agency reviewing psychologist, completed a Psychiatric

Review Technique form on February 6, 2002, and concluded that Mineo had only a mild degree of limitation in his activities of daily living, maintaining social functioning, concentration, persistence or pace, and there were no episodes of decompensation of extended duration (AR 385).

Progress notes from Community Integration covering the period from June 2002 through May 2004 show that Mineo was seen by Lynn Taylor, PA-C (AR 411-421; 439-444).  On June 14, 2002, Ms. Taylor reported that his appearance, behavior, mood/affect and cognition were within normal limits, he did not suffer from hallucinations and was not a danger to himself or others (AR 421).  Mineo complained of anxiety, especially agoraphobia, claiming he could not leave the house (AR 421).  He was also reportedly depressed and suffering from insomnia (AR 421).  Ms. Taylor noted that his response to treatment had been "partially ineffective" (AR 421).  She increase his Paxil and Ativan dosage, and substituted Sonata for the Restoril (AR 421).  Ms. Taylor assigned him a GAF score of 50 (AR 421).[3]

On July 16, 2002, Ms. Taylor reported that Mineo was "doing well", his anxiety was better and he was thinking of attending culinary school (AR 419).  His appearance, behavior, mood/affect and cognition were within normal limits, he did not suffer from hallucinations, and was not a danger to himself or others (AR 419).  Ms. Taylor reported that his response to treatment was "good", assigned him a GAF score of 50, and increased his Ativan dosage (AR 419).

When seen by Ms. Taylor on August 27, 2002, Mineo reported that he was unable to secure funding for culinary school, was having difficulty obtaining a job and was discouraged (AR 417).  Ms. Taylor reported that his mental status examination was within normal limits, and his response to treatment had been "partially effective" (AR 417).  She assigned him a GAF score of 50, substituted Xanax for the Ativan, added Desyrel to his medication regime and referred him to individual counseling (AR 417).

On November 11, 2002, Mineo reported he was still unemployed and complained of

---

[3]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

boredom, but was still agoraphobic (AR 416).  Mental status examination was within normal limits and Ms. Taylor found his response to treatment was adequate (AR 416).  She assigned him a GAF score of 50 (AR 416).

Mineo complained on February 13, 2003 that his medication made him groggy and his sleep was still not regulated (AR 413).  His mental status examination was within normal limits (AR 413).  His response to treatment was noted as fair to poor, his medications were changed and he was assigned a GAF score of 45 (AR 413).

On March 12, 2003, Ms. Taylor reported that Mineo's appearance, behavior and cognition were within normal limits, he did not suffer from hallucinations and was not a danger to himself or others (AR 414).  His mood/affect was depressed, but Ms. Taylor found no acute, developed depression (AR 414).  Mineo complained of feeling partially "hung-over" from his medications and claimed he slept 13 or 14 hours per day (AR 414).  Ms. Taylor discontinued chloral hydrate and added Valium to his medication regime (AR 414).  She noted his response to treatment was partially adequate and assigned him a GAF score of 50 (AR 414).

Mineo had no acute complaints on May 1, 2003, and requested discontinuance of the Valium (AR 412).  He complained he felt groggy during the day (AR 412).  His mental status examination was within normal limits, Ms. Taylor reported his response to treatment had been partially adequate and assigned him a GAF score of 50 (AR 412).

On July 15, 2003, Ms. Taylor reported that Mineo's mood was depressed, but his remaining mental status examination was within normal limits (AR 411).  She reported that he failed to "show up" on the first day of a new job - "again", and he reportedly could not leave the house (AR 411).  His response to treatment was reported as adequate, he was again referred to individual therapy and assigned a GAF score of 50 (AR 411).

On October 3, 2003, Ms. Taylor reported that Mineo had not attended individual or group therapy sessions (AR 444).  Although his mental status examination was within normal limits, Ms. Taylor assigned him a GAF score of 45 (AR 444).

When seen by Ms. Taylor on December 5, 2003, Mineo reported that he continued to have early morning awakenings, was doing "nothing" during the day, and "need[ed] to go to work" (AR 443).  His mental status examination was within normal limits (AR 443).  Ms. Taylor

observed no acute depressive state and none was reported, although she noted Mineo still had "work phobia" (AR 443). She assigned him a GAF score of 50 and added Trazadone to his medication regime (AR 443).

On February 3, 2004, Mineo reported sleeping poorly, complained of increased panic attacks with agoraphobia, increased isolation and paranoia when out in public (AR 442). He claimed that his anxiety was so high that during a recent grocery shopping trip he was unable to leave the parking lot for over two hours (AR 442). Ms. Taylor noted that his appearance, behavior, mood/affect and cognition were within normal limits and he denied any suicidal or homicidal ideations (AR 442). Mineo felt the Ativan was ineffective, and Ms. Taylor switched it to Valium and increased his Paxil dosage (AR 442). She reported his response to treatment was inadequate and assigned him a GAF score of 50 (AR 442).

Mineo returned to Ms. Taylor on March 10, 2004 and reported a facial tick since his Paxil dosage was increased (AR 441). His mood/affect was noted as depressed, and he complained of increased paranoia, out of body type sensations, general feelings of disassociation around people in public places, increased isolation, anxiety and feelings of panic (AR 441). Ms. Taylor discontinued the Valium and substituted Xanax, decreased his Paxil dosage due to its side effects and added Risperdal for his disassociation symptoms (AR 441). His GAF score was reported as 50 (AR 441). He continued to complain of poor sleep and disassociative episodes when seen on March 26, 2004 and claimed he did not leave the house (AR 440).

On May 13, 2004, Mineo reported no change in his depression and that he still suffered from sleep problems (AR 439). Mental status examination was within normal limits, Ms. Taylor assigned him a GAF score of 45 and increased his Risperdal dosage (AR 439).

On August 10, 2004, Ms. Taylor reported that Mineo suffered from panic disorder with agoraphobia and major depression, that she had treated him since June 2002 and that his status had deteriorated (AR 438). She indicated that his symptoms included fear of public places and fear of the public in general, and when out of his home, he experienced intense anxiety, usually resulting in paranoia and panic (AR 438). According to Ms. Taylor, Mineo described disassociate type feelings at home and in public, and subsequently became depressed due to his fear and isolation (AR 438). She opined that the nature of his condition precluded him from

7

employment on a regular basis (AR 438).  Ms. Taylor's report was co-signed by Mary Anne Albaugh, M.D., a psychiatrist (AR 438).

On the same date Ms. Taylor authored her report, Leon Reid, Ph.D., a non-examining medical advisor, reviewed the psychological evidence of record through July 2003 and concluded that Mineo did not meet any Listing under 12.04 Mental Disorders and that the record suggested he suffered from an adjustment disorder (AR 428).  Dr. Reid noted that Dr. Carney found no deficiencies in Mineo's ability to make occupational, performance and personal-social adjustments and had assigned him a GAF score of 55, suggesting only moderate symptoms (AR 428).  Dr. Reid further noted that in December 2001 Dr. Ulus also assigned him a GAF score of 55, and that Community Integration treatment notes in July 2003 rated him as "doing well" and he was thinking of attending culinary school (AR 428).  Dr. Reid opined that his activities of daily living were not limited, his social functioning was adequate for his lifestyle, including multiple sex partners, his concentration, persistence and pace were moderately limited due to off and on headaches, and there was no evidence of decompensation (AR 428).  He concluded that Mineo would be best placed in a routine type unskilled or semi-skilled job that required the use of average intelligence or less, with limited contact with the public that did not require above average decision making (AR 428).

B.      *Physical impairments*

Mineo was evaluated by Antonio Flores, M.D., a neurologist on February 21, 1997 for complaints of headaches, neck pain and back pain due to a work-related injury in November 1996 (AR 277-278).  Physical examination was basically normal, except for some weakness in his left grip and mild atrophy of his left calf (AR 278).  Dr. Flores assessed him with post head trauma headaches, although there was no indication of intracranial pathology (AR 278).  He was prescribed Prednisone, Flexeril and Vicodin (AR 278).

Mineo returned to Dr. Flores in March 1997 and complained of constant headaches (AR 356).  Dr. Flores prescribed Percocet and Vicodin, along with other medications (AR 356).  Mineo complained in September 1997 that his headaches were getting worse, with blurred vision off and on (AR 263).  In October 1997, in addition to his complaint of constant headaches, Mineo claimed he was not sleeping well at night (AR 264).  In November 1997, he reported

8

continuing headaches and difficulty sleeping at night (AR 356).

When seen by Dr. Flores in June 1998, Mineo complained of daily headaches (AR 261). In August and September 1998, Mineo reported constant headaches (AR 352-353).

In March 1999, Mineo complained of daily headaches, with some days "worse than others" (AR 259).  In April 1999 he reported that his headaches occurred "off and on" (AR 260). He continued to complain of radiating headaches in June 1999, and Dr. Flores prescribed Oxycontin and refilled his Vicodin prescription (AR 350).  When seen by Dr. Flores in July 1999, Mineo reportedly was "doing well" and his headaches were "much better" (AR 351).  Dr. Flores assessed him with "post-traumatic headaches - better" and refilled his Vicodin and Oxycontin prescriptions (AR 351).

Mineo was also treated for his headaches by Dr. Slabic (AR 317-322).  On October 13, 1999, Mineo reported chronic tension headaches (AR 320).  Dr. Slabic diagnosed cervical headaches related to his previous injury and prescribed Vicodin (AR 320).  Mineo subsequently contacted Dr. Slabic by telephone on October 20, 1999 requesting a prescription for Oxycodone since he was leaving town on an emergency (AR 318).  When questioned by Dr. Slabic regarding his request, Mineo claimed he was calling from a drugstore out of state, which Dr. Slabic indicated "made no sense" (AR 318).  His treatment notes reflect that Mineo "actually sounded out of it" and Dr. Slabic refused his request (AR 318).

When Mineo returned to Dr. Flores in December 1999, Dr. Flores reported that Fioricet had worked "very well" in controlling his headaches, and again diagnosed his post-traumatic headaches as "better" (AR 348).

Mineo returned to Dr. Flores in April 2000, and reported that his headaches were always "there" (AR 253).  In June 2000, however, he reported suffering from headaches off and on, approximately every other day (AR 254).  In July 2000 he complained of headaches off and on (AR 346).

On September 23, 2000, Mineo was evaluated by Gregory Murray, D.O., pursuant to the request of the Commissioner (AR 279-282).  Mineo claimed he suffered from headaches following a work related injury (AR 279).  He stated that his headaches originated in the posterior region and threaded forward (AR 279).  Mineo claimed they usually occurred in the

early morning hours upon awakening, but resolved throughout the day and were relieved with pain medication (AR 279). Dr. Murray's neurological evaluation of Mineo was essentially normal, and he found that his symptoms appeared to be well-controlled with pain medication (AR 281).

Frank S. Bryan, M.D., a state agency reviewing physician, reviewed the medical evidence of record on October 5, 2000 and concluded that Mineo could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and was unlimited in his push/pull ability (AR 284).

Mineo returned to Dr. Slabic in December 2000, who noted he had not seen him in over one year (AR 317). Dr. Slabic reported he had a "tension headache component" (AR 317). He formed an impression of chronic pain, and because Mineo had been using narcotics for some period of time, Dr. Slabic wanted to limit his use (AR 317). He was prescribed a small amount of Vicodin with no refills (AR 317).

In February 2001 Mineo returned to Dr. Slabic for follow-up and reported that his headaches had worsened over the past six months (AR 321). He described a throbbing headache that started in the back of his neck which was precipitated by being out in the cold (AR 321). He denied any occular scintillations but complained of nausea (AR 321). He reported that Fioricet seemed to help (AR 321). Dr. Slabic was concerned about his chronic use of narcotics (AR 321). On physical examination, Mineo's pupils were equal, reacted to light directly and consentially, and his neck was supple with no evidence of tightness or spasm (AR 321). He assessed Mineo with headaches, with some features suggesting a migrainous component and some suggesting contracture headaches (AR 321). Dr. Slabic suggested an MRI, and prescribed Inderal, Fioricet for the short term with no refills and Vicodin with two refills (AR 321).

In March 2001, Dr. Slabic's treatment notes reflect that Mineo telephoned a pharmacy requesting that his Vicodin be filled due to an emergency, but Dr. Slabic wrote "no more narcotics" (AR 321).

Mineo reported to Dr. Flores in August 2001 that he suffered from headaches off and on (AR 344). On October 19, 2001, Dr. Flores completed a Health-Sustaining Medication

Assessment Form for the Pennsylvania Department of Public Welfare and opined that Mineo was permanently disabled due to a primary diagnosis of post-traumatic headaches and a secondary diagnosis of depression (AR 332-333).  The form report reflects that he based his assessment on Mineo's physical examination, a review of his records and his clinical history (AR 333).

On November 16, 2001, Mineo was seen by John E. Balmer, D.O. (AR 364).  He reported frequent headaches for which he had taken Fioricet for one year, and had taken Vicodin for leg pain for two years (AR 364).  His neurological examination was intact and Dr. Balmer assessed him with headaches (AR 364).  He was prescribed Vicodin and Fioricet (AR 364).

An MRI of Mineo's brain, including the brain stem, conducted on January 29, 2002 was negative (AR 365).

On February 6, 2002, Mineo was seen by Matthew T. Wiza, D.O., and complained of a bad headache off and on for the last two days (AR 367).  He denied any dizziness or vision changes, but had been nauseated with the pain (AR 367).  Dr. Wiza informed Mineo that he was concerned about continuing his Soma and Vicodin, and again went over the pain management and narcotic agreement (AR 367).

On April 15, 2003, Mineo was seen by Laurie Troup, D.O. as a new patient (AR 406-407).  He relayed a past history of *inter alia*, tension headaches with a normal MRI (AR 406).  His neurological examination was unremarkable (AR 407).  He was assessed with chronic headaches and prescribed Neurontin with no refills (AR 407).  Dr. Troup informed Mineo that she did not routinely prescribe narcotics (AR 407).

Mineo returned to Dr. Flores in June 2003 and complained of daily headaches with some days worse than others (AR 401).  Dr. Flores diagnosed post-traumatic headaches (AR 401).  In July 2003, Mineo reportedly claimed that the Vicodin was not working (AR 400).  When seen by Dr. Troup in July 2003, Mineo reported that he had been off several of his medications, including the Neurontin, but did not notice a difference in his headaches (AR 404).  Dr. Troup discontinued this medication since it did not seem to be "efficacious for him" (AR 404).

On August 5, 2003, no headache complaints were noted during his visit with Dr. Troup, but on August 19, 2003, he complained of headaches off and on when seen by Dr. Flores (AR 403; 430).  In December 2003 Mineo reported to Dr. Flores that his headaches were about the

same (AR 433).

Mineo complained of headaches when seen by Dr. Flores in April 2004, and in May 2004 claimed he had daily headaches that were "very bad" at times (AR 436). Finally, Mineo complained of daily headaches in August 2004 (AR 437).

Mineo testified at all three hearings held by the ALJ. At the first hearing, Mineo testified that he suffered from daily headaches for which he took Duracet, Halpaninol and Zoloft (AR 459). He claimed that some days were worse than others, and on average, he spent four to five hours lying down approximately four to twelve days per month (AR 468). He testified that he was able to walk for approximately twenty minutes, stand for not more than one hour without having to change positions and sit for about two hours (AR 465-466). He further testified that he suffered from depression, claiming some days were worse than others, and on bad days he was unable to be around people (AR 470).

At the second hearing, Mineo testified that he suffered from daily headaches, becoming incapacitated several times per week (AR 487). He testified that he became nauseous and sensitive to light and noise (AR 502). His medication regime caused grogginess and blurred vision (AR 489-490). Mineo testified that he watched television, occasionally listened to the radio, attended church, performed some household chores and drove several times a week (AR 492-494). He was able to lift five to ten pounds, stand for approximately forty-five minutes and sit for approximately one hour before having to change positions (AR 493; 495). He further testified that he experienced dizziness, concentration and memory problems, and cold weather caused more frequent headaches (AR 496-497).

Mineo testified at the last hearing that he suffered from mild headaches every other day, with more extreme headaches occurring two to three times per week (AR 517). When suffering from an extreme headache, he testified that he took medication and would lay down in a dark room (AR 517). His medications included Paxil, Xanax, Risperdal, Doxepin, Ambien, Esgec and Soma, which caused drowsiness, nausea, dry mouth and occasional dizziness (AR 520-521). Mineo claimed he experienced concentration and memory problems, had low energy, felt worthless and had feelings of hopelessness (AR 518; 526). He occasionally performed household chores, watched television, grocery shopped three or four times per month,

occasionally attended church, but would not enter church if there were cars in the parking lot (AR 521-522; 532-533).  He claimed he was able to carry twenty pounds, stand for approximately forty-five minutes, sit for approximately two hours before changing positions, had problems with balance and dizziness at times, but no problems with his arms or hands (AR 523-525).  He testified that no treating physician had imposed any limitations (AR 530).

Mineo claimed that he had good days and bad days emotionally, which were split about 50/50 (AR 534).  On bad days, he testified that he did not leave the house since he did not want to be around people (AR 534).  He indicated that his panic attacks had decreased with new medication, but he still suffered from attacks three to four times per month lasting twenty minutes to one-half hour each, and also had feelings of paranoia (AR 536).

Leon Reid, Ph.D., a psychological medical expert, testified that Mineo did not meet or equal any Listing under mental disorders, but rather, suffered from an adjustment disorder (AR 538).  Dr. Reid reviewed the Community Integration treatment notes during the hearing and testified that the records reflected Mineo's self-reported symptoms rather than the psychiatrist's opinions (AR 542).

The ALJ asked Fred Monaco, the vocational expert, if work existed for an individual of Mineo's age, education and past work experience, who was limited to light work, lifting and carrying no more than twenty pounds; who required a sit/stand option at his discretion; who was limited in pushing and pulling in the lower extremities; who could only occasionally bend, kneel or stoop; who was limited in the ability to deal with the public and could have only minimal interaction with peers and supervisors; and who was limited in the ability to make complex decisions, follow detailed instructions, cope with stress in emergency situations and adapt to frequent changes in a work setting (AR 544-545).  The vocational expert testified that such an individual could perform work as an unarmed guard, document preparer and a machine operator (AR 545).  The vocational expert further testified that such an individual would not be able to work if he needed to lie down during the day due to severe headaches (AR 546).

Following the hearing, the ALJ found that Mineo was not eligible for SSI benefits (AR 8-16).  His request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner.  He subsequently filed this civil action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Mineo's case at the fifth step. At step two, the ALJ determined that his subjective pain, mental depression, and other physical and mental symptoms were severe impairments, but determined at step three that he did not meet a listing (AR 10). At step four, the ALJ determined that Mineo could not return to his past work as a heavy laborer, but retained the residual functional capacity to perform light work, lifting no more than twenty

14

pounds with a sit/stand option at his discretion; with limited pushing and pulling with his lower extremities; occasional bending kneeling and stooping; and was further limited to no public contact; only minimal interaction with peers and supervisors; and could not make complex decisions, follow detailed instructions, cope with stress in emergency situations and adapt to frequent changes in a work setting (AR 14).  At the final step, the ALJ determined that Mineo could perform the jobs cited by the vocational expert at the administrative hearing (AR 15).  The ALJ additionally determined that his testimony was not credible to the extent he alleged be incapacitated and unable to work (AR 15-16).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Mineo argues that the ALJ erred in his evaluation of the medical evidence with respect to both his mental and physical impairments.  We shall address each of these arguments in turn.

> A.    *Mental impairments*

Mineo first argues that the ALJ erred in failing to discuss his mental health treatment records after January 14, 2002 although he continued to receive mental health treatment after that date, and ignored Ms. Taylor's report dated August 10, 2004 opining that his condition precluded employment.  *Plaintiff's Brief* pp. 9-10.  We agree.  In evaluating a claim for benefits, the ALJ must consider all of the evidence in the case.  *See Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999).  She is explicitly required to weigh all relevant, probative, and available evidence.  *Adorno v. Shalala,* 40 F.3d 43, 48 (3rd Cir. 1994).  The ALJ may not summarily reject medical evidence; she must articulate in writing her reasons for discounting it.  *See Plummer*, 186 F.3d at 429; *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3rd Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981).

Here, while the ALJ discussed one treatment note from Community Integration, she failed to discuss or make any findings relative to the remaining treatment notes.  These records chronicle Mineo's mental health treatment with Ms. Taylor from June 14, 2002 through May 13, 2004  (AR 411-421; 439-444).  While Ms. Taylor generally reported that his mental status examination was within normal limits on these visits, Mineo consistently complained of depression, anxiety, agoraphobia, paranoia, panic attacks and insomnia (AR 411-414; 416; 421; 439; 441-442).  Ms. Taylor reported on only one occasion that his response to treatment was

good (AR 419), and on other occasions reported that it was either adequate (AR 411; 416), partially adequate (AR 412; 414; 417; 421), fair to poor (AR 413), or inadequate (AR 442). Moreover, she never assigned him a GAF score above 50, which indicates  "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

Likewise, the ALJ's decision is devoid of any discussion of Ms. Taylor's report dated August 10, 2004, wherein she opined that Mineo suffered from panic disorder with agoraphobia and major depression, that his condition had deteriorated, and that he was precluded from employment on a regular basis (AR 438).

We fully recognize that the ALJ is not required to discuss every relevant treatment note. *See, e.g., Fargnoli v. Massanari,* 247 F.3d 34, 42 (3rd Cir. 2001).  We further recognize that Ms. Taylor, as a physician's assistant, is not an "acceptable medical source" whose opinion is entitled to controlling weight.  *See* 20 C.F.R. § 416.913(a); *Krupa v. Barnhart,* 2006 WL 1517374 at *6 n.8 (E.D.Pa. 2006) (physician's assistants are not acceptable medical sources).  Nonetheless, the Commissioner's regulations specifically list a physician's assistant as an "other source" who may provide information on how an impairment may affect a claimant's ability to work, *see* 20 C.F.R. § 416.913(d)(1), and further provide that a psychiatric nurse or psychiatric social worker can "normally provide valuable functional information" regarding a claimant's impairment.  20 C.F.R. § 404, Subpt. P, App. 1, § 12.00 D(1)(c).  Given the fact that Ms. Taylor has treated Mineo since June 2002, we are of the opinion that this evidence is sufficiently material to require discussion and analysis by the ALJ.  *See Williams v. Apfel*, 98 F. Supp. 2d 625, 632 (E.D.Pa. 2000) (concluding that social worker's findings relative to claimant's mental impairments were clearly pertinent to a determination of whether claimant was capable of working); *Carter v. Apfel,* 220 F. Supp. 2d 393, 397 (M.D.Pa. 2000) (finding that chiropractor's treatment  was relevant and probative on the issue of the claimant's symptoms even though chiropractor was not an acceptable medical source).

The Commissioner concedes that the ALJ "inadvertently omitted" mentioning these mental health treatment records and Ms. Taylor's opinion. *Defendant's Brief* p. 11.  However,

the Commissioner argues that an ALJ is not required to use particular language or adhere to a particular format in conducting her analysis, as long as there is sufficient development of the record and explanation of findings to permit meaningful judicial review.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3ʳᵈ Cir. 2004).  In *Jones,* the court concluded that the ALJ's decision, read as a whole, illustrated that the ALJ discussed the evidence pertaining to the claimant's impairment and considered the appropriate factors in reaching the conclusion that she did not meet a Listing. *Jones*, 364 F.3d at 505; *see also Scatorchia v. Commissioner of Social Security*, 137 Fed. Appx. 468, 470-71 (3ʳᵈ Cir. 2005) (finding that the ALJ had satisfied the *Jones* standard by "*clearly evaluating the available medical evidence in the record* and then setting forth that evaluation in an opinion" even though the ALJ did not identify or analyze the most relevant Listing) (emphasis added).  While we agree no particular format is prescribed, this case is distinguishable from *Jones* since the ALJ's decision here is completely devoid of any discussion of above mentioned evidence.

Because the ALJ is required to give some reason for discounting the evidence she rejects, and the ALJ's decision here fails to address the previously discussed mental health evidence, we are therefore of the opinion that a remand is appropriate so that the ALJ can specifically address this evidence.

B.    *Physical impairments*

We reach a different conclusion however, with respect to the ALJ's evaluation of the medical evidence relative to his post-traumatic headaches.  Mineo argues that the ALJ selectively reviewed and/or ignored Dr. Flores' treatment notes which demonstrated that he frequently complained of constant headaches and was consistently diagnosed with post-traumatic headaches.  It is undisputed that Mineo suffers from headaches which the ALJ found was a severe impairment (AR 10).  However, disability is not determined by the mere presence of an impairment, but rather by the functional restrictions placed on an individual by those impairments.  *See Jones v. Sullivan*, 954 F.2d 125, 129 (3ʳᵈ Cir. 1991).

Here, the ALJ reviewed Mineo's complaints of headaches and concluded that he failed to demonstrate a disabling impairment.  The ALJ recognized the he complained of headaches since a work related accident in November 1996, but noted that he suffered no neurological symptoms

or conditions (AR 11-12).  The ALJ further noted that he had unremarkable neurological evaluations with no indication of intracranial pathology when seen by his treating and examining physicians from February 1997 through October 2003 (AR 12).  The ALJ observed that Dr. Flores reported in December 1999 that Fioricet worked "very well" in controlling his headaches, and that they were still reported as well controlled by Dr. Murray in September 2000 (AR 12).  Finally, an MRI of Mineo's brain on January 29, 2002 revealed no abnormalities (AR 12).

All of these findings are supported by the record and we therefore find no error in this regard.  Although Mineo complained of frequent, debilitating headaches, there were no objective signs and findings in the medical evidence.  Dr. Flores found no intracranial pathology for his headache symptoms during his initial examination in 1997 (AR 278).  Dr. Murray's neurological evaluation of Mineo in September 2000 was essentially normal, and he concluded that Mineo's symptoms were well-controlled with medication (AR 281).  When seen by Dr. Balmer in November 2001, Dr. Balmer reported that his neurological examination was intact (AR 364).  An MRI of his brain, including the brain stem, conducted in January 2002 was negative (AR 365).  Dr. Troup's neurological examination of Mineo in April 2003 was unremarkable (AR 407).  Finally, although Mineo complained of constant headaches, the medical notes are devoid of any objective evidence supportive of a disabling condition, and Dr. Flores consistently reported that Mineo was in no acute distress when seen (AR 253-254; 259-261; 263-264; 344; 346; 348; 350-353; 401; 430; 433).[4]

Mineo further challenges the ALJ's rejection of Dr. Flores' opinion that he was disabled due to his headaches.  It is well settled that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence.  *See Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988).  Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so.  *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence,

_____

[4]Parenthetically, we reject Mineo's argument that the ALJ referred to only one visit with Dr. Flores between February 1997 and August 2004 since it is factually inaccurate.  The ALJ specifically cited to seventeen office visits from Dr. Flores' treatment notes in connection with his headache complaints, which span from February 12, 1997 through October 16, 2003 (AR 12).

he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Contrary to Mineo's contention, we find that the ALJ's evaluation of Dr. Flores' opinion was consistent with the above standard. As previously set forth, Dr. Flores opined on October 19, 2001 that Mineo was permanently disabled due to a primary diagnosis of post-traumatic headaches (AR 332-333). The ALJ declined to accord Dr. Flores' opinion controlling weight since it was unsupported by the independent clinical findings and in direct conflict with the objective medical findings (AR 14).[5]

As observed by the ALJ, "[t]he ultimate decision concerning the disability of a claimant is reserved for the Commissioner." *Knepp v. Apfel,* 204 F.3d 78, 85 (3rd Cir. 2000). The pertinent regulations provide that opinions on some issues, including the opinion of whether a claimant meets the statutory definition of disability (i.e., is "disabled" or "unable to work") are not medical opinions "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case. ..." 20 C.F.R. § 416.927(e).

Further, a treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will only be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2). Here, we conclude that the ALJ could properly decline to accord Dr. Flores' opinion controlling weight under these standards.

As the ALJ observed, Dr. Flores' opinion was unsupported by the clinical findings as set forth in the progress notes. Although Dr. Flores considered Mineo permanently disabled, his clinical examination was at odds with this opinion. As discussed previously, Dr. Flores found no intracranial pathology for his headache symptoms during his initial examination in 1997, his subsequent treatment notes are devoid of any objective evidence supportive of a disabling

---

[5]Mineo argues that the ALJ inappropriately relied on findings reported by Drs. Cohen and Rho in rejecting Dr. Flores' opinion, since these physician's did not evaluate him for headache complaints. However, the ALJ's decision reveals that she did not, in fact, rely on these opinions in rejecting Dr. Flores' opinion. Her decision demonstrates that she merely considered all opinions with respect to Mineo's disability in the same paragraph (AR 14).

condition, and he consistently reported that Mineo was in no acute distress when seen (AR 253-254; 259-261; 263-264; 278; 344; 346; 348; 350-353; 401; 430; 433).  Moreover, as noted by the ALJ, we observe that Dr. Flores' opinion was also at odds with other examining physicians' findings.  For example, Dr. Murray's neurological evaluation of Mineo in September 2000 was essentially normal, his neurological examination was intact as performed by Dr. Balmer in November 2001, and Dr. Troup's neurological examination in April 2003 was unremarkable (AR 281; 364; 407).  Finally, his January 2002 MRI was negative (AR 365).  We therefore find no error in this regard.

## IV. CONCLUSION

Based upon the foregoing reasons, Mineo's motion for summary judgment shall be denied and the Commissioner's motion for summary judgment shall be denied.  The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.  In addition to the ALJ's reexamination of the evidence relative to Mineo's alleged mental impairment, the ALJ is free to seek additional evidence and/or call a vocational expert if she feels it is necessary.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN R. MINEO,                                  )
                                                )
                    Plaintiff,                  )
                                                )        Civil Action No. 06-3 Erie
                                                )
          v.                                    )
                                                )
JO ANNE BARNHART,                               )
Commissioner of Social Security,                )
                                                )
                    Defendant.                  )

## ORDER

AND NOW, this 11th day of December, 2006, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 17] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 21] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.

21